Boyd this morning. Case number five is Kleven against Colvin. Mr. Duncan. Good morning your honors. Dina Duncan appearing on behalf of Brenda Benefits. It was one of 1,648,537 disability case reviews conducted by Social Security in 2014. The issue in this is really, and I'll try to boil this into one particular fine point, is whether there is a difference or a change in circumstances in her condition which they define as a medical improvement. A medical improvement is change in either the condition or the symptoms. Let me ask you two questions. One is about burden of proof and the other is as this medical improvement is assessed, how, if at all, do intervening new problems come into play? Do you have to just pretend they're not even there? Do they factor in somehow? First of all, the burden of proof on a cessation case rests with the commissioner. These cases are not hindsight. They're not, well we think we may have made a mistake before so we're going to correct it now. There has to be something more. Once you establish or review the condition upon which the claimant was found disabled, for instance, the easiest thing to consider would be as if they met a listing. If that condition subsides and they're no longer meeting a listing, then you would go to the other steps, steps four and five, and determine whether the residual functional capacity would still be work preclusive. And at that point, would you take any new information? I mean, people don't remain static necessarily over a five or six year period. Correct. I believe that's why the ALJ in this particular case reviewed all of the medical records from 2011 up until the time of the hearing, was to establish that there wasn't anything significant in any of those because even though she had had problems with her breast, on her kidney, none of that was, in his opinion, arose to the level of a disabling condition. So in this case, I'll try to put it down that it's that medical improvement that's the case and we have it arise in this, in two instances. One is the treating doctor and two, whether the claimant was credible. Now in this particular case, Dr. DeHart completed a report in 2007 and indicated a set of findings which were ultimately incorporated into the findings of the state agency and her case was approved. That happened in 2007. In 2011, they decided she'd improved. He soon after, at the request of counsel, at the time of appeal of that cessation, completed another report dated March 6, 2012, where he basically indicated the exact same limitations existed. So the question is, is what changed? The ALJ cited that that should not be given weight because of three reasons. Lack of objective wanted to help out his patient. Now the easiest one here is to address the third because there's nothing in this record that shows that Dr. DeHart was trying to help out the claimant. If that, if the burden of proof were that low in every case, all an ALJ needed to do is say, well, I believe that the doctor's trying to help out the claimant and it would automatically be grounds then to reject the treating physician statement. Well, why don't you talk for a minute about Dr. Bomer's examination because it seemed to me as a practical matter, the ALJ relied heavily on that. You must have repeated that 16 times that she picked up her purse, actually. Yes. One type of examination, and there's a reason. Social Security establishes a policy that says that a treating doctor is to receive greater weight than an examining non-treating doctor because he has longitudinal history. And if you look at this, we have Dr. DeHart treating her from 2006 through 2013. And if you look at all of the medical records during this timeframe, they're all consistent. Now on that given day, we don't know exactly what her condition was. Was she having a good day, where her back was not giving her as much problems? Did she take the extra oxycodone that she'd been prescribed? Because the biggest change in this case was, is that at the time of her surgery, she was on 80 milligrams. And then by the time she was found to have a medical improvement, she was given 20 milligrams, but given three 5 milligram tablets to take as needed for breakthrough pain. Did she take two or three of those when she went in? She knew she was going to have to be physical. We don't know that from this record. And it would have been nice if that would have been brought up in the hearing. And as I've said in the briefs, if we were to, as an applicant bar, try to see what the ALJ may find in the record, we would have six-hour hearings. And it's just not efficient. So when the ALJ is reviewing the case, and I believe that's why Angstren and Beardsley were decided the way they were, if the ALJ sees something that he thinks is an issue of credibility or needs to be addressed, he should raise it at the time of the hearing and give the claimant an opportunity to respond. Now is there some confusion in this record about whether she's got neurological deficits versus other kinds of problems? There's another person, right? It's a neurosurgeon who looks at her? Correct. Well, what we have here is, and this is again a situation, I think it was Dr. Johnson, if I remember correctly, did an assessment, or Dr. Stevens, excuse me, did an assessment of her. But she never complained about neurological problems. No, and I don't see that there really is. I think this is really basically a soft tissue injury. And in this particular case, the ALJ characterized Dr. Stevens' opinion as being that there was nothing wrong with her. She was there to have an evaluation as to whether there should be additional surgery or have the hardware removed. The 2009, excuse me, the 2011 x-rays, which the ALJ said were not causing problems, the x-ray stated, there are findings consistent with previous thoracic spine trauma with interval fixation using a right lateral surgical plate at T7, 8, 9 levels. And there are traversally oriented screws through the proximal end of this plate, which extend through the T7 vertebrae body. And there are two transversely oriented screws through the T7 vertebral body. And there are two transversely oriented screws through the inferior aspect of the side plate, which extend through the T9 vertebrae body. So I understand, your point must be that there's something going on, that this isn't what most of us are walking around with. The reason I'm reading this, your honor, is basically you read this and you go, this sounds like something that might cause somebody pain. And when you have hardware like this in your body, you can't say conclusively that she is not having pain. And that's the problem. We have lots of credibility findings, but there's no pain analysis. And there really doesn't outline this. Again, the only reference made to the fact that there's been an improvement, the judge pointed out that Dr. Leonard, who did the surgery at UW-Madison, said her recovery time was going to be about a year. Well, the surgery was in October, excuse me, November of 2006, and she was approved in October of 2007. So about 11 months later, they approved her. So if there was indeed a concern that she was going to have that improvement in a year, why was it approved? Why not consider it further and see where she was at that point in time? It just doesn't make a lot of sense. If you want to save a little bit for rebuttal, now would be the time to do it. Yes. All right. Thank you. All right. Thank you. All right. Good morning, Ms. Schacht. Good morning. May it please the Court, my name is Meredith Schacht and I represent the Acting Commissioner of Social Security. How long has Acting Commissioner Colvin been the Acting Commissioner? For her entire tenure. Several years now. It's at least several years. Yeah, my understanding is that there's not going to be confirmation hearings anytime soon. Really? Okay. All right. So my initial problem with this, or concern, has to do with the first question I asked Mr. Duncan, which is burden of proof. Burden of proof often makes a difference in these cases where you have, you know, a treating physician, you've got somebody with a fairly lengthy litany of problems. You have a couple of other people, you know, the reviewing physicians, the one person who does the one examination. So if the burden of proof is on the Commissioner, it seems to me there's a lot to show that although perhaps she's not as bad as she was when she was lying on the operating table after this terrible accident, she's not well enough to work. I agree with Appellant's counsel that the I'm pretty clear under the law, right? Yes. So that is true, but there is still significant evidence, substantial evidence, as is required to support the ALJ's decision. What's the ALJ's best evidence in your view? The ALJ's best evidence, I think probably the best evidence is Dr. Boehmer's report. Dr. Boehmer conducted an examination of Ms. He recorded quite clearly his observations. Right. He says she doesn't have scoliosis. He's not really talking about the pain. She can pick up her purse and she, as he puts it, bounces into the car without any apparent difficulty. She's got an antalgic gait and he sees that she's losing some bone density and so on, but he's speculating about whether her pain severity is as bad as she says it is. He's not speculating, Your Honor. He made some observations about inconsistencies between her reaction and what he would expect. He may be experiencing some chronic post-surgical pain. And I don't think that anybody debates that she's in pain. The standard is not that she be pain-free. No, no, it's not that. But the total disregard of the treating physicians, lengthy period of treating her, unless you think this doctor actually should be indicted by the U.S. Attorney for promiscuous use of oxycontin and oxycodone and so forth, he thinks she's in pretty serious pain. He keeps her on very significant opioids for a long time. He does have her on a regimen of opioid medication for quite a while and it proved to be fairly effective. Well, and she's still on it in 2013. She is. The record shows that her dose did not elevate, did not go up very much over time. The record reflects that she did not use her oxycodone for breakthrough pain very often. His notes, Dr. DeHart's notes, regularly indicate that she does not need a refill on those oxycodone short-acting, quick-acting pain medications because her other medications were working effectively. But she's full of medications for the pain. She does have underlying conditions that could be expected. It's not somebody coming in, you know, some of the people with, what am I thinking of, chronic pain syndromes. It's not fibromyalgia. It's not fibromyalgia. You know, she had a terrible accident and was left with crushed vertebrae. At one point, they're talking about essentially fixing her entire spine. And he's treating her with very significant pain relievers. So the pain, it seems to me, is clearly real. And if it's enough to prevent her from working either a 40-hour week or if it's enough to cause her to miss, say, four days of work a month, the Social Security Administration says the person can't work. And it's uncontested that this was a very serious accident, that she had a serious injury, and that's why she was awarded benefits. But experiencing a severe injury and a terrible accident is not enough to be permanently disabled. Well, it may or may not be. But, you know, she says she's got the chronic back pain. She's falling all the time. She's, you know, she's got... That's why I asked about the additional things, too, because once you get beyond whatever recovery she's had from the accident, there's still a residual functional capacity determination, I assume. Right, which the ALJ listed. He completed a residual functional capacity, which was an assessment, and he explained why he found that she could do this very limited range of sedentary work. He's not suggesting, although appellant says in her brief that the ALJ found she could do light work, the ALJ didn't find even that she could do that. No, it's sedentary. It was a very limited range of sedentary work, saying that she could do this reduced range with only occasional use of her legs, only frequent, not constant, use of her hands. He went through all of the evidence and identified the limitations that she continued to suffer. Now, can she lie down during the day? I suppose she could over the break, over her lunch break. I don't think that that was... The ALJ did not find that was a necessary... What she testifies is that she can't sit or stand for very long, that she's got to lie down several times per day. Let's forget about the days that she stays in bed all day. And the ALJ explained... And the ALJ kind of over-read the camping, so-called camping, where she goes with her family. Well, the ALJ didn't over-read it. The ALJ considered it. He asked her about it. He found it troubling that she says that she has difficulty staying in one position and then would choose to go and spend her entire day inside of a very limited space of a camper. Why wouldn't you do that if they got you out of the house? What's implausible about that? The ALJ found that it was implausible in light of her testimony that she couldn't sit in one position. Yeah, and she says she spends most of the time lying down in the camper and she's got a ramp that her husband built. She says she spends most of her day lying down in the camper, but she also testified that she had to sleep sitting up. I mean, I think it was reasonable for the ALJ to consider this inconsistency. It wasn't the only basis for his determination. He also considered her testimony in light of the medical evidence. He considered the opinion of the state agency physician who thought that her... Of course, they're economic. I mean, they think people can do everything, state agency physicians. Well, that's not true in this case. The state agency physician, Dr. Korshidi, actually gave quite a restrictive residual functional capacity as well, although the ALJ went even further than Dr. Korshidi based on some of plaintiff's testimony and based on some of Dr. DeHart's testimony. And he thoroughly explained... How can you tell the difference between as though he were doing it for the first time versus a restoration of capacity review? Well, it's a slightly different analysis. I know it's an eight-part test, and that's not what I'm asking, but the tenor of the ALJ's discussion is that he's making a de novo determination. Well, he first considered the issue of medical improvement, so he essentially dealt with that earlier in the opinion, but the final residual functional capacity taking into account all of her medical records as of the time of the hearing was essentially de novo. He conducted that in light of the earlier evidence, but it was a complete review of the evidence. So let me ask this. If we should, as a matter of law, heavily discount treating physicians because they have a relationship with the patient, doesn't that eliminate the treating physician rule? That can always be said of a treating physician, so it really means there is no treating physician rule. There's just, you know, you've been with the patient so we don't trust you rule, the opposite of the treating physician rule. And what's unique about this case... No, every case. You can say that every time. And certainly the commissioner would not suggest that that should be a blanket rule. But it can be said every time, right? I don't know that it can. The reason that the ALJ said it in this instance is because Dr. DeHart did not include in any of his treatment notes strength training, neurological testing... Why did he need to do that, though? Because that's what he based his opinion on. Well, he's watching her, yeah. He indicated in his opinion that she had deficits in strength, that she had deficits in range of motion, but there's nothing in his treatment notes to support that. Outside tests, which is troublesome because if she doesn't have financial resources, I guess, I don't know who's going to pay for all of that, but it's... Well, she saw Dr. DeHart frequently, as she notes, as the court notes. Right, but as you know, outside tests cost money. But he doesn't need an outside test to conduct a range of motion testing. He can do that in his office. Dr. Boehmer did that in his office. Other doctors regularly did that. It's reflected in other medical records. He simply didn't do it. He doesn't need to do outside testing to test the strength of her arms and legs, but nowhere in his treatment notes does it indicate that he did those. He simply recorded her complaints. And because he relied too much on those complaints, the ALJ reasonably discounted his opinion, and we would ask that you affirm the ALJ's decision. Okay, thank you very much. Thank you. Thank you. I think you have about a minute, Mr. Duncan. Thank you. Just two points. First of all, as I laid out in my reply brief, when the issue of the strength testing and range of motion were decided or looked at, if you look at the records from Dr. DeHart before 2007, and then after, between 2007 and 2011, and then again after the improvement point, they're the same. They found him credible and gave him weight in 2007, and then he does the exact same treatment. There's no range of motion, no strength testing before, and then all of a sudden now they decide, well, that isn't there, so now we're going to discount. The other point here is, and you made the mention of the camping, it just seems sometimes that it's stretching to come up with rationale to support. The ALJ stated, Dr. Smith's notes, which suggest the claimant was actively involved with camping, does not correlate to the claimant's report of spending or the entire time in the camper. The record, when you look at it, says she was camping, she wants to go back to her family, and if they were there for the weekend. There's nothing implied in that. Okay. Thank you. Thank you very much. Thanks to both counsel. We'll take the case under advisement.